

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2003 APR 16  PM 2: 08

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| REGGIE E. GUILBEAU, individually, and on behalf of his minor children, REGGIE TYLER GUILBEAU and BLAKE EVERETT GUILBEAU, <br><br> Plaintiff <br><br> VERSUS <br><br> PARISH OF TERREBONNE, ROBERT J. BERGERON, individually, and in his capacity as President of the Parish of Terrrebonne, JERRY J. LAPENTER, indvidually, and in his capacity as Sheriff of the Parish of Terrebonne, MARCEL NULL, individually, and in his capacity as Wardenof the Terrebonne Parish Criminal Justice Complex, LT. DENNIS LECOMPTE, MARGE WHITNEY, MEDIC "NINA," LT. SAUL TANNER, and ED BYERLY, <br><br> Defendants | * CIVIL ACTION <br> **03-1080** <br> * <br> * NUMBER: <br> **SECT. A MAG. 1** <br> * <br> * SECTION: <br> * <br> * MAGISTRATE: <br> * <br> * JURY TRIAL |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

**Now Comes,** plaintiff, Reggie E. Guilbeau, who respectfully represents to this Honorable Court as follows:

Fee $150.
Process
X Dktd
CtRmDep
Doc.No.

# I. JURISDICTION

**A.** Plaintiff brings this action pursuant to 42 U.S.C.S. § 1983 and 28 U.S.C.S. §§ 2201, 2202, and the Eighth and Fourteenth Amendments to The Constitution of the United States of America.

**B.** Plaintiff brings this action under the same provisions as in Section A., as plaintiff alleges that defendants violated his civil rights by intentionally detaining him illegally.

**C.** Plaintiff brings state tort claims individually in negligence and intentional infliction of mental anguish and on behalf of his minor sons for diminution of quality of relationship and companionship as is permitted under the pendant jurisdiction of the Federal Rules of Civil Procedure.

# II. VENUE

Venue is proper as the unconstitutional and tortuous commissions and omissions by the defendants about which plaintiff complains occurred in the Parish of Terrebonne, State of Louisiana, which is within the territorial venue of this Court.

## III. PARTIES

**A.** Reggie E. Guilbeau, is a male citizen of the United States of America, thirty (30) years old, and domiciled in the Parish of Lafouche, State of Louisiana.

**B.** Defendants are as follows:

1.  The Parish of Terrebonne, which is a governmental body of the State of Louisiana, duly chartered by the Legislature of this State;

2.  Robert J. Bergeron, individually, and in his capacity as President of the Parish of Terrebonne, State of Louisiana, who is a male citizen of the United States of America and domiciled in the Parish of Terrebonne;

3.  Jerry J. Larpenter, individually, and in his capacity as Sheriff of the Parish of Terrebonne Parish, who is a male citizen of the United States of America domiciled in the Parish of Terrebonne;

4.  Marcel Null, individually, and in his capacity as Warden of the Terrebonne Parish Criminal Justice Complex ("TPCJC"), who is a male citizen of the United States of America domiciled in the Parish of Terrebonne;

5.  Lt. Dennis Lecompte, who is a male citizen of the United States of America domiciled in the Parish of Terrebonne, and an employee of the Parish of Terrebonne or the Office of the Sheriff of that Parish;

6. Marge Whitney, who is a female citizen of the United States of America, of the full age of majority domiciled in the Parish of Terrebonne and an employee of the Parish of Terrebonne or the Office of the Sheriff of that Parish;

7. "Nina," whose full name in unknown at this writing, but who will be identified in the course of this litigation, and is believed to be a citizen of the United States of America domiciled in the Parish of Terrebonne;

8. Lt. Saul Tanner, who is a male citizen of the United States of America domiciled in the Parish of Terrebonne, and an employee of the Parish of Terrebonne or the Office of the Sheriff of that Parish; and

9. Ed Byerly, who is a male citizen of the United States of America domiciled in the Parish of Terrebonne, and an employee of the Parish of Terrebonne or the Office of the Sheriff of that Parish;

## IV. DAMAGES

The defendants are liable to plaintiff, individually, and on behalf of his minor sons, jointly, severally, and *in solido*, in special and general damages in the amount of **FIVE MILLION AND NO/100 ($5,000,000.00) DOLLARS**, plus punitive damages permitted by Federal Law, reasonable attorney fees, plus judicial interest from the date of demand until paid for the reasons that follow:

## V. FACTS FORMING THE BASIS
## OF PLAINTIFF'S CLAIMS

1. On or about November 5, 2002, while incarcerated in the general population Dorm C-500 at TPCJC for driving while intoxicated, plaintiff suffered acute onset of difficulty in breathing. Before that, plaintiff had complained to the medical staff of TPCJC of increasing numbness in his hands and feet.

2. Plaintiff signaled the corrections officer on duty by electronic buzzer and intercom available to inmates in general population dorms (known as "buzzing the booth"). The officer responded by saying that he would call a medic. He did not. Plaintiff caught the attention of a medic escorted by a corrections officer walking by.

3. After plaintiff described his numbness and difficulty breathing to the officer with the medic listening, the medic stated that plaintiff must be seen by medical staff. The officer and medic left; the officer came back, then escorted plaintiff to escort him to the nurses station.

4. At the nurses station, a medic told plaintiff that he was fine. Plaintiff insisted that he suffered recurring breathing difficulty and that the numbness in his feet and hands were progressing, and that his tongue was now numb. Because the medic did not believe plaintiff, he removed his shoes and socks, then

showed the medic the purple discoloration that had developed in his feet. After only looking at plaintiff's feet, the medic told plaintiff that she would leave a note for the head nurse, defendant Marge Whitney. A corrections officer escorted plaintiff back to Dorm C-500.

5.  The next day, plaintiff submitted another written request for medical attention stating that the numbness in his feet, hands, and tongue was worsening, that he had not received medical assistance since he had been complaining of the numbness, and that he needs to be seen by a doctor immediately.

6.  The next day, at about 8:00 a.m., a doctor examined plaintiff in the presence of defendant Whitney and other medical personnel at TPCJC. Plaintiff gave the doctor a history of sudden onset of numbness of the feet, hands, and, later, his tongue, beginning about two or three weeks earlier and a developing heaviness in his chest causing difficulty in breathing. He told the doctor that the numbness seemed to be increasing in intensity with accompanying increasing pain in his legs, hand, and even more so in his feet. The physician tested plaintiff's reflexes in his legs and arms. He found none. The doctor explained to plaintiff that the numbness and absence of reflexes were likely due to anxiety

related to being imprisoned. He prescribed medicine for the alleged anxiety. Plaintiff disagreed; he asked defendant Whitney for permission to see his family physician. Defendant Whitney stated that plaintiff can see a private physician only at plaintiff's expense and if the physician was in the Houma area, then ordered plaintiff back to population.

7. Later that day, with the numbness worsening and feeling as though it was migrating above plaintiff's ankles into his lower legs, plaintiff attempted to walk down a flight of stairs from his bunk. The staircase was constructed in such fashion as having two half-flights of stairs with a platform dividing the half flights. Plaintiff stumbled when his feet and lower legs collapsed under the weight of his body. He tumbled down the first half flight of stairs onto the mid-platform. He lay still, believing he had injured his upper back and neck. Inmates buzzed the corrections officer in the booth; medics responded. One of the medics, in response to plaintiff's claim of numbness in his feet, tested for feeling in plaintiff's feet. There was none. Plaintiff believed the source of the increasing numbness was in his back, and that the fall had aggravated the back problem, causing an increase in this paralysis or numbness problems. He complained of the pain in his upper back and neck, which he believed was caused by the fall

down the half-flight of stairs. The other medic left the scene to alert defendant
Whitney.

8. Defendant Whitney came to the scene of plaintiff's fall. Plaintiff, while
still laying on the mid-platform, explained to Whitney what happened, including
the cause of the fall being the numbness and weakness in his feet and lower legs.
Defendant Whitney accused plaintiff of malingering, and demanded that he stop
pretending; she ordered him to get up. He could not. Whitney ordered an officer
to get a wheelchair, then told plaintiff that he was going to be taken to Leonard J.
Chabert Medical Center (Chabert) in Houma. When the officer returned pushing
a wheelchair, he stopped at the bottom of the staircase. The two officers standing
over plaintiff, lifted his arms and dragged him down the lower half-flight of
stairs to the officer below waiting with the wheelchair. The officers sat plaintiff in
the chair, then wheeled him to the nurses station to complete the necessary
paperwork for transport to Chabert.

9. At Chabert ER, plaintiff explained his symptoms to a physician,
including the results of the doctor's examination at TPCJC and that doctor's
impression of anxiety-related paralysis. The ER physician tested plaintiff for
reflexes. After finding no reflexes, the ER physician called upon two medical

personnel to assist him in such manner as to prevent plaintiff from intentionally causing a negative result. Still, there was no reflexes. The ER physician performed minor tests, including x-rays of the cervical and thoracic spine.

10. The ER physician told plaintiff that plaintiff needed to have a neurologist to look at him, and that arrangements would have to be made at "ACC," which is an office where appointments are arranged. The ER physician left to telephone defendant Whitney for permission. Upon information and belief, Whitney told the physician that plaintiff did not need a neurology appointment, that plaintiff had been seen and properly diagnosed by a doctor in prison, and that he was malingering.

11. When the ER physician returned from phoning TPCJC, he told plaintiff that nothing was wrong with him, that he should continue taking the medicine prescribed by the doctor who examined him at TPCJC. When officers transported plaintiff back to Dorm C-500, defendant Whitney ordered the corrections officers to assign plaintiff to a bunk at the lower level of Dorm C-500.

12. Later in the day, plaintiff complained again that the numbness in his lower legs, hands, and tongue was intensifying and, as to his legs and hands, seemed to be creeping upward. He also complained of pain in his upper back

and neck which he believed was caused by the tumble down the half-flight of stairs days earlier.

13.  Between 11:30 p.m. and midnight on or about November 7th, plaintiff suffered another sudden onset of shortness of breath, but this time more severe than those he suffered earlier. He buzzed the corrections officer in the booth. The officer contacted medical. About an hour later, an officer assisted plaintiff out of Dorm C-500, then escorted him to the nurses station. The medic, defendant "Nina," insisted plaintiff was fine, that his perceived difficulty in breathing and paralysis were "all in his mind." Nina offered plaintiff Benadryl to help him relax.  Plaintiff insisted upon seeing another doctor; defendant Nina refused to permit that. Plaintiff accepted the Benadryl pills; the corrections officer escorted him back to C-500. Plaintiff could only walk slowly, wobbling with caution, as his feet were numb and the numbness had risen above his ankles.

14. The next day, at approximately 1:00 p.m., plaintiff attempted to walk to the toilet, but fell because his feet felt paralyzed and could not support his weight. When inmates buzzed the booth, plaintiff complained to the corrections officer that his feet were. The corrections officer ignored plaintiff.  Plaintiff continued to buzz, perhaps 15 to 20 times, until approximately 4:00 p.m.

15.   Defendant Lt. Dennis Lecompte and a medic entered the dorm, then stepped up to plaintiff's bunk. Defendant Lecompte hollered at plaintiff; plaintiff ignored him, as the told the medic that his feet were paralyzed, to look at them because the purple color of his feet had intensified and the area of increasing purple discoloration had increased. Plaintiff asked the medic to test his reflexes. The medic refused; she told plaintiff that defendant Whitney had told everyone that plaintiff was a malingerer and had ordered that no matter what he complains about, the nurses and medics were not to help him.

16.   Plaintiff pleaded with defendant Lecompte to help him get medical care, that he was not malingering. Lecompte glared at plaintiff, then turned toward the other inmates and yelled to them that plaintiff was a malingerer, that he was acting out his paralysis. Lecompte ordered that the inmates be denied television privileges for the rest of the day because they had helped plaintiff, and if inmates helped plaintiff again to the bathroom, to get his food tray, or in any other way, television privileges for the entire dorm would be denied permanently.

17.   Later the same day, plaintiff submitted another written medical request (he maintained a cache of them under his mattress). In the request he

wrote that the numbness in his feet, hands, and tongue was worsening and progressing, that his back and neck hurt from the fall down the stairs, and that he needed medical attention. No one responded to plaintiff's written request.

18.  During the evening of November 10th or 11th, plaintiff tried to walk to the bathroom despite the numbness in his feet and legs. His feet and legs gave way; he fell to the floor. His legs, hands, and arms were too numb for him to lift himself off the floor. Other inmates told him not to move. Afraid of the warning of defendant Lecompte, no inmate would help plaintiff to his bunk. Finally, an inmate buzzed the booth.

19.  After apparently being contacted by the corrections officer in the booth, defendant Nina and others entered the dorm. Plaintiff still lay on the floor near the entrance to the bathroom, still unable to lift himself. Nina asked plaintiff what was wrong with him; plaintiff said something to the effect that it was the same problem he had been complaining about verbally and in writing for weeks, that his feet and legs were paralyzed and numb, and that his legs cannot support his weight.  Plaintiff also told defendant Nina that his upper back and neck burned. Defendant Nina accused plaintiff of "playing a game and making a fool of himself." She ordered plaintiff to stand up. Plaintiff told her he could not, that

he needed to see a doctor.

20. Defendant Nina turned to a corrections officer who had come into Dorm C-500 with her. She ordered him to get "The Board." [1] The corrections officer left the scene, then returned with The Board. They lifted plaintiff and lay him on the hard surface of the stretcher, then latched a brace across his neck. They strapped plaintiff across his chest, leaving his arms free, then secured his head to The Board by circling tape around plaintiff's forehead and underside of The Board.

21. Plaintiff pleaded not to be immobilized, that all he needed was a wheelchair so he could get around. He complained that the chest strap bounded him too tightly and that his upper back and neck burned with pain on the hard surface of The Board.

22. Defendant Nina responded to plaintiff's pleas by telling him that he had been insisting on medical care, that now he was going to get what he wanted, that she was going to provide him "medical monitoring."

---

[1]"The Board" is the kind of mobile stretcher used by paramedics at injury scenes when, out of precaution, the injured person is completely immobilized to avoid further spinal or internal injury during transportation.

Page 13 of 45

23. Strapped and immobilized on The Board, the corrections officers wheeled plaintiff to the nurses station, then positioned him against a wall near the station's counter. Defendant Nina arranged for a video camera to be fixed on plaintiff, then arranged for an officer to stand watch over him. Defendant Nina's tortuous "medical monitoring" began at approximately 11:00 p.m.

24. Before leaving plaintiff's side while he was immobilized on The Board and against the wall, defendant Nina told plaintiff that she knew he was malingering, pretending his paralysis. She told him that until he admitted that he was lying about his symptoms and promised to get up and walk normally, she would keep him strapped and immobilized on The Board, no matter his complaints of pain.

25. Defendant Nina remained in loud speaking distance of plaintiff. He begged her to free him, that his back and neck were hurting, the chest strap was too tight, and that he needed to lift his head to breathe properly. Defendant Nina repeated the same condition for his freedom from immobilization, which in paraphrase was: "admit that you are malingering and promise to get up and walk normally, then I will free you."

26.  After several hours, plaintiff's back and neck began hurting to the extent that he could no longer bear it.  Despite the numbness in his hands and arms, he managed to strip tape from his forehead in an effort to free himself. The corrections officer watching plaintiff alerted defendant Nina of plaintiff's attempts to free his head from The Board. Each time plaintiff managed to remove tape, defendant Nina stepped from her station, into the hall, jerked plaintiff's hands away, then re-taped plaintiff's forehead to The Board. On one occasion the officer guarding plaintiff attempted to push plaintiff's hand down, but quit doing so when plaintiff warned the officer not to touch him.

27.  Plaintiff continued trying to strip the tape from his head; Nina warned him that if he did not stop, he would be "in trouble." Plaintiff yelled and cursed in frustration and pain until he decided that was futile.

28.  At approximately 6:00 a.m., near the end of her shift, defendant Nina restated her conditions for plaintiff's freedom from her tortuous "medical monitoring." Plaintiff had been strapped to The Board from approximately 11:00 p.m. to approximately 6:00 a.m. Plaintiff agreed to defendant Nina's conditions, as he believed no one would free him from the torture he had endured throughout the night.

29. After corrections officers unstrapped plaintiff, freeing him from The Board, he could neither lift himself nor walk without assistance.

30. The officers did not take plaintiff back to general population, but to a small room, approximately ten by five feet. They lay plaintiff on the floor of the room, then tossed a blanket toward him. They left, locking the door behind them.

31. Not long after the officers left plaintiff--having been strapped to The Board all night for about seven hours under defendant Nina's torture–plaintiff had to urinate. He started screaming for help. No one came. Plaintiff placed his hands on the wall for balance, then attempted to stand. After falling a number of times, he succeeded to stand. Using the wall, he wobbled along, trying to reach the door. When he rested, standing up, he found himself in front of a small observation window suddenly staring at defendant Nina and two or three corrections officers watching him. Plaintiff yelled a plea to get him out of the room so he could relieve himself. One of the officers left his surveillance post, then opened the door to the small room.

32. A corrections officer escorted plaintiff out of the observation room to a bathroom in the booking area, but the officer refused to physically assist plaintiff along the way. Plaintiff walked as best he could close to the wall to protect

himself from falling. Another officer walked ahead of plaintiff, filming him with

a video camera (much of the interactions between plaintiff, the corrections

officers, and the medical staff were recorded, upon information and belief to

prove plaintiff was malingering when he finally gave into defendants' Nina's,

Whitney's, and Lecompte's threats regarding helping plaintiff). While on the way

to the bathroom, plaintiff asked one of the corrections officers for medical help.

The officer refused, accusing plaintiff of the general belief among everyone in

authority over plaintiff–that plaintiff was a malingerer making a fool of himself.

33.  After plaintiff relieved himself, he again asked the officers to get him

medical help; the officers refused. They escorted plaintiff back to the observation

room, again, forcing him to wobble slowly to keep from falling, videotaping him.

As plaintiff reached the room, he collapsed at the threshold.  One of the officers

grabbed him, then dragged him into the room. They left him on the floor.

34.  Later that morning, a corrections officer entered the observation room

pushing a wheelchair, then wheeled plaintiff to the nurses station where another

doctor waited for him. The doctor told plaintiff that he had spoken with

plaintiff's mother. He tested plaintiff's reflexes in his arms and legs, but, again,

for the third notice to the nursing and medical staff, found that plaintiff had no

reflexes. The doctor also mentioned his impression that plaintiff suffered paralysis due to the anxiety of imprisonment.

35.  Plaintiff told the doctor that he could not walk because the paralysis had migrated up his legs, that he had to have help to use the restroom, and that he had not been able to shower for days because his legs cannot support his weight. Believing that some problem in his back initiated the paralysis problems and the fall down the half-flight of stairs worsened it, plaintiff mentioned his tumbling down the stairs in Dorm C–500 and the pain in his upper back and neck pain caused by the fall.  The doctor said he would make arrangements for an EMG at Chabert. Plaintiff felt some relief. The officers took him back to the observation room, lay him on the floor, then left.

36.  About an hour later, a corrections officer entered the small room pushing a wheelchair; another officer entered with the first officer, videotaping. The officers wheeled plaintiff back to general population Dorm C-500, then to his bunk.

37.  On or about November 11th, plaintiff submitted another written request for medical attention. He wrote that he could not feel his feet, the numbness in his hands and tongue were getting worse; he was suffering pain

between his shoulder blades and up his neck, and the medication the doctor had ordered upon the first examination did nothing to help him.

38. On evening pill call, with assistance from one of the inmates, plaintiff managed to reach the hatch hole in Dorm C-500 to grab his medicine from the hand of the medic. Plaintiff asked the medic to examine his feet, telling her that they were turning a darker purple. The medic agreed, but asked plaintiff to wait until she passed out all the medication. The inmate who assisted plaintiff to the hatch hole walked plaintiff to a table and chairs in the center the dorm, then sat plaintiff down on a chair to wait for the medic to return as she had promised.

39. While sitting in the chair, plaintiff removed his shoes and socks. After completing pill call, the medic returned escorted by a corrections officer. Plaintiff lifted his pants above his knees exposing his feet and lower legs to prepare for the medic's return. When she arrived, plaintiff showed the medic that the bottoms of his feet were dark purple, the tops a lighter hue of purple; and red blotches were breaking out on the skin of his lower legs. Despite the weakness in his arms and hands, plaintiff used them to lift his legs off the seat of the chair and his feet off the floor. He demonstrated to the medic that he had no ability to move his feet either side-to-side or up and down, that his feet were

paralyzed, both suffering what is known as "drop foot." Plaintiff reminded the medic that the all three doctors who examined him could find no reflexes. The medic tested for reflexes but found none (the fourth time no reflexes were found). Plaintiff told the medic that arrangements were being made to send him to Chabert for an EMG. The medic told him that arrangements through the prison to do that could take months, even as long as a year. Plaintiff asked if she could help expedite the arrangements. The medic told him all she could do is advise defendant Whitney know about the problem. Plaintiff told the medic that telling Whitney would do no good, that if he did, Whitney would just punish him again. The medic and her officer-escort left.

40. With the help of other inmates, plaintiff managed to telephone his mother. He repeated what the medic told him about the delays in transporting prisoners to Chabert for medical procedures. He asked his mother to help him.

41. About a half hour after "lights out," two corrections officers entered Dorm C–500. They walked to plaintiff's bunk, then ordered plaintiff off the bunk. Plaintiff told them he could not get out of bed by himself without falling on the floor because his feet and legs were numb, nearly paralyzed. The officers gripped plaintiff's body, then rolled him off the bunk, allowing him to fall to the floor.

They flipped over plaintiff's mattress, then confiscated all the copies of medical requests in his cache. As he lay on the floor, plaintiff asked the officers to tell the medical department that his numbness, paralysis, and pain were getting worse. One of the officers looked down at plaintiff and said something to the effect that, "no one cares." Then, the officers left.

42. On or before November 13th, defendant Ed Byerly, the medical administrator of TPCJC, gave notice to defendant Lt. Saul Tanner that plaintiff should be sent to a state facility to have a neurologist to assess his paralysis problems. Defendant Tanner ignored defendant Byerly's order; defendant Byerly knew that his recommendation had been ignored, but did nothing to make certain his recommendation was acted upon, leaving plaintiff to continue suffering from progressing paralysis.

43. On or about November 13th, at morning pill call, plaintiff asked the medic whether she could see about getting him moved to a medical dorm because he could not get around without a wheelchair and could not shower because his feet and legs could not support his body weight, that he even had to depend upon other inmates to bring him his food tray and to the toilet. Upon information and belief upon the orders of defendants Whitney and Nina, the

medic refused.

44.  Plaintiff managed to obtain another medical request form. He submitted it, stating that more blood blotches were coming out on his legs, that his feet were totally numb and that the numbness felt like it was creeping up his legs. He also reported that the numbness in his hands seemed to be traveling up his lower arms, and the numbness in his tongue was worsening. Plaintiff wrote that he cannot shower without a chair in the shower, and his paralysis seemed to be progressing at a faster pace on a day-by-day basis.

45.  By November 15th, the inmates began to complain when plaintiff requested help to the toilet, to bring him his food tray, or any other requests for help. The inmates reminded plaintiff about defendant Lecompte's warning regarding television privileges if they helped him in any way. Plaintiff tried to get to the bathroom and other places on his own, but his feet and legs could not support his weight, causing him to fall to the floor.  Later, needing to use the restroom, plaintiff attempted to crawl out of his bunk. He fell to the floor, then lay there too weak to raise himself. The inmates refused to help plaintiff because of defendant Lecompte's threats regarding denial of television privileges. Finally, an inmate buzzed the booth; the corrections officer in the booth ignored several

buzzes over the course of approximately an hour.

46. The officer in the booth finally responded while plaintiff still lay on the floor. Through the intercom, he ordered the inmates to stop buzzing, that he had already contacted medical about plaintiff's problem, that medical ordered him to do nothing to help plaintiff. Despite that, the officer told the inmates to get plaintiff off the floor and on his bunk. The inmates told the officer that if they helped plaintiff, defendant Lecompte would take away their television privileges. The officer said something to the effect that he had done his job, to just leave plaintiff on the floor if that is what they wanted to do. The inmates lifted plaintiff and lay him on his bunk.

47. After about an hour, three corrections officers entered Dorm C-500, one pushing a wheelchair. When plaintiff asked where they were taking him, one of the officers told him that he was going to "medical lockdown."

48. The officers wheeled plaintiff to the isolation cells in Dorm C-100, a disciplinary dorm. When plaintiff protested, one of the officers told him that defendant Whitney had ordered it for his own safety because he is constantly falling on the floor in the general population dorm. The officers told plaintiff that C-100 was chosen because the cells are small, and everything (meaning the bunk,

toilet, and a desk) were "at his fingertips."

49. Plaintiff pleaded with the officers to take him back to Dorm C-500,
where he could get help from reluctant inmates when he needed it, that in the
isolation cell he could not communicate to anyone if he had breathing problems.
The officers told plaintiff that they cannot disobey medical orders. They wheeled
plaintiff into the first isolation cell in C-100, situated under a stairway, lifted him
out of the chair, then lay him on his bunk. Then, they tossed plaintiff's personal
items on the floor, walked out of the cell, and locked the door to the isolation
cell.[2]

50. After the guards left, plaintiff raised himself and sat up in his bunk.
Later, a trustee came with food trays.[3] The trustee hollered for plaintiff to come
get his tray; plaintiff explained that he could not walk. He asked the trustee to
call a guard to open the door, and that he needed something to drink. The trustee

---

[2]The cells in C-100 are constructed such that corrections cannot be contacted
(buzzed) if plaintiff had breathing problems or needed help. The isolation cell plaintiff
was placed under the staircase was such that no one could see him without
considerable effort.

[3]The doors to cells in C-100 are approximately two inches thick. There is a
horizontal center opening and two horizontal openings in the upper part of the door
and two horizontal openings in the lower portion. In addition to general purposes,
trustees pass food trays through the center opening.

refused both requests.  When plaintiff made no effort to walk toward the door,

the trustee attempted to balance the tray in the center opening of the door, then

walked away. The tray fell, spilling plaintiff's food on the floor.  Plaintiff yelled

for help. None came. Plaintiff lay down and decided to try to sleep hungry and

thirsty.

51.  Plaintiff woke having to urinate. He managed to get out of his bunk

and stand. The desk was a couple of feet from his bunk. Using the desk, plaintiff

managed to make it to the toilet, then back to his bed.

52.  Later that night, a medic escorted by a corrections officer came to C-

100 to pass out medicine. When she came to plaintiff's cell, she called out to

plaintiff through the opening in the door. Plaintiff told her he was paralyzed and

could not walk to the door. Despite his explanation, the medic insisted that he

come to her. Plaintiff tried to get up, and managed a slow, wobbled walk toward

the door. The medic extended her hand with plaintiff's pills through the opening;

plaintiff reached as far as he could and managed to grab his medicine.

53.  Plaintiff asked the medic when would he be allowed out of isolation,

that he did not deserve punishment for being sick. The medic said it was up to

defendant Whitney. Plaintiff pleaded to be moved to a medical dorm so he could

have a wheelchair, but even if he could be returned to Dorm C-500, he could at least get inmates to help him on the toilet and to shower. The officer with the medic told plaintiff that "they" are probably trying to find a place for him; the medic suggested that he submit a medical request to defendant Whitney. Plaintiff suggested that Whitney would probably punish him even more if he did that.

54. The next morning, November 16th, a different trustee from the one that dropped the tray the day before brought the breakfast tray. Plaintiff suffered hunger pangs and thirst, since he had missed his last meal. He told the trustee that it would take a while for him to reach the door. The trustee told plaintiff to begin trying, that the trustee would serve the other inmates, then return, giving plaintiff time to make his way to the opening of the door. By the time the trustee returned, plaintiff had made it to the door. He managed to take possession of the tray and have his cup filled. He sat on the floor by the desk to drink and eat.

55. When plaintiff finished eating, he tried to get up from the floor to reach his bunk. He fell and could not lift himself from the floor. He yelled for help to guards he could see through the door opening passing by his cell door. The guards ignored him. He began to crawl, taking what seemed to be about ten

minutes to reach his bunk. He managed to get his chest on the bunk, then reached for and grabbed the bunk frame. He managed to pull himself up on the bunk, then wiggled his waist and thighs until his body settled on his mattress.

56. Later that day, a medic accompanied by a corrections officer came with plaintiff's medication. Plaintiff managed to sit up, but his body listed. He could not shift his weight in the opposite direction of the leaning of his upper body. He fell on the floor. The medic told plaintiff not to move, then instructed the officer to open the door. The officer called the booth, then opened the door. The medic walked toward plaintiff and asked whether he could get on the bed by himself. Plaintiff explained that he could not, that his legs were paralyzed, and his arms were weak with numbness. The medic placed the medication on the desk, then insisted that the officer help her lift plaintiff onto his bunk. Before the medic left, plaintiff complained to her that the staff was punishing him for being sick. He explained that the three doctors who tried could not find reflexes. The medic asked why he was in isolation; the officer explained to her that plaintiff was in "medical lockdown." Plaintiff asked for help to use the toilet, then asked the medic if she would help him obtain permission to be given a medical shower so that he could clean himself, that he had not had a shower for days.

57. Later at lunch time, the trustee handing out food trays–the trustee who had helped plaintiff at breakfast--insisted that the corrections officer open the door of plaintiff's isolation cell rather than to force him to crawl on the floor or risk falling while wobbling to the door. The officer complied with the trustee's request to open the cell door.

58. During stay in disciplinary lockdown in the C-100 isolation cells, corrections officers permitted one inmate at a time to leave his cell for approximately an hour and walk about the floor area. The officers unlocked the cell door electronically from the observation booth. During one of the times when an inmate was allowed out of his cell, plaintiff convinced him to call plaintiff's mother, as the correction officers in the booth refused plaintiff's request to make a call. The inmate called plaintiff's mother two or three times because plaintiff kept remembering things he had forgotten to tell his mother.

59. Plaintiff's numbness and paralysis were progressing at a more rapid rate. He learned if he needed to stand, he could "lock his knees," but could not walk stiff-legged because his feet and legs could not support his body weight, causing him to topple to the floor.

60. Later, two corrections officers entered plaintiff's cell, one pushing a wheelchair. They lifted plaintiff out of his bunk and sat him in the chair. When plaintiff asked where they were taking him, one of the officers said that they were going to get him cleaned up. They wheeled plaintiff into the property room where a medical shower–a shower with a seat installed in it–was located. The officer called for a trustee to assist him with plaintiff. The officer and trustee managed to get plaintiff on the shower seat. The officer told plaintiff to take his time.

61. In the shower, plaintiff tried to get out of his orange uniform, but his arms were too weak for him to raise them to remove the top of his prison attire; his legs were numb, near paralyzed, so he could not remove his pants. An officer helped him undress, but no one would help him shower. Plaintiff managed to clean his chest, shoulders, abdomen, and groin, but could not clean the back of his thighs, nor the outside and inside his buttocks. They remained soiled. Officers dressed plaintiff, sat him in the wheelchair, then wheeled him back to his isolation cell in Dorm C-100.

62. On the way back to his isolation cell, plaintiff asked an officer if he would help plaintiff make a telephone call. The officer agreed. Plaintiff reached

his mother. He told her what was happening to him, that she has to do something. He told his mother that his numbness and paralysis had progressed, involving his arms, legs, tongue, and now he could feel it in his chest, that he was sure that he would die in the isolation cell since he could not call for help; he could not buzz the booth if he had breathing problems; and there were no inmates to help him.

63. Later that day, while on his bunk, plaintiff needed to urinate. He managed to sit up in his bunk and attempted to stand to get to the toilet. He locked his knees, then attempted to walk to the bathroom, but fell on the floor. He crawled to the toilet, grabbed hold of the seat, then tried to pick himself up. He could not. He crawled back to his bed, but could not lift himself up. He gripped the bunk frame as he had before, but his body weakness had progressed to the point that he could not pull himself up. He started yelling for help. No one came.

64. At pill call the medic who had helped plaintiff earlier came to the door of plaintiff's cell escorted by a corrections officer. Plaintiff still lay on the floor next to his bunk, unable to lift himself. He begged for help. The medic instructed the officer to open the door. When the medic and officer entered plaintiff's cell,

plaintiff asked the medic to help him get out of isolation, that he would die in isolation because he was weakening on a day-by-day basis and he had no way to alert anyone. She said she could not do anything, that she would inform defendant Whitney. Plaintiff asked for help to the toilet; the officer helped.

65.  The medic and officer left with plaintiff still on the toilet. When plaintiff tried to get off, he fell on the floor. He did not have the strength to pull up his pants. He began yelling. He lay on the floor for several hours, his pants at his knees. An officer passing by the door of the cell told him he would be coming soon. The officer opened the door, then lay plaintiff on his bed. Plaintiff pleaded with the officer to get him out of isolation. The officer said he would look into it.

66.  Later, plaintiff lifted himself while on his bunk. His body listed again. He was too weak to counter the pull of gravity; he fell to the floor. Plaintiff could not raise himself, but mustered the strength to crawl to the door to yell for help. The same officer who earlier signaled him assisted plaintiff. About two hours later, that officer with other officers entered the isolation cell with a wheelchair.

67.  Officers lifted plaintiff from his bunk and sat him in the wheelchair, while another collected plaintiff's personal effects. They wheeled plaintiff to Dorm  B-200. Dorm B-200 is a medical dorm but not designed for wheelchairs.

Plaintiff dared not complain, for fear he would be returned to isolation. He reasoned that he would be among other inmates who might be willing to help him, or at least buzz the booth. The numbness had crept higher in his legs, and farther up his arms, and had settled deeper in his chest; the pain in his upper back and neck had not resolved. Plaintiff was virtually bedridden. That night, at pill call, the medic permitted another inmate to take plaintiff's medicine to him.

68.  While in medical Dorm B-200, the only way plaintiff could get around was to be virtually or actually carried, or dragged, by other inmates. He could not get his own food tray nor use the toilet without help. He could not shower. The only time he left the cell in Dorm-200 was to use the telephone to call his parents to ask for help. To get to the phone, at first, he would drape his arms around the shoulders of two inmates and attempt to walk, but could do little to lighten the burden of his weight. Gradually, his paralysis prevented him from even attempting to walk; he told the inmates who agreed to help him to just drag him to the telephone or toilet.

69.  As plaintiff continued to telephone his family, the officers showed more resistance to allowing the calls; the inmates in the medical dorm, who themselves were ill or aged, were tiring of assisting him. Plaintiff's condition

continued to worsen.  The TPCJC staff refused to give him a urinal, claiming he was not in a hospital. He fell often, and often had no one to drag him to the toilet. When plaintiff fell, and could not get up; he would lay on the floor and look at the ceiling until someone buzzed the booth. The officer responded by saying that buzzing will do no good, that medical had told the corrections officers on duty that if plaintiff fell on the floor, just leave him there. Because the officers obeyed the medical staff and did not respond, the inmates quit buzzing the booth when plaintiff fell. They just lifted him off the floor and lay him back on his bunk quietly.

70.  At pill call, all the medics except defendant Nina would allow an inmate to take plaintiff's medicine to him. Defendant Nina refused to permit that. She continued to accuse plaintiff of malingering, and insisted that if plaintiff wanted his medicine, he would have to walk normally to the hatch hole and take his medicine from her himself. Plaintiff's paralysis prevented him from doing that.

71.  Defendant Nina would required plaintiff to make his way to the hatch hole himself if he wanted his medication. During the advanced stage of plaintiff's paralysis and numbness, he could not get out of bunk. While

defendant Nina stood at the hatch hole during pill call, another inmate helped plaintiff to the hatch hole, then propped him up in front of defendant Nina. Defendant pointed to her head and screamed that plaintiff was crazy. Plaintiff told her that he will see a specialist soon, who will prove that she was wrong. After he said that, the inmate who was holding plaintiff, lost his strength, causing plaintiff to fall to the floor. The inmate dragged plaintiff to a chair in the room, and sat him down. Nina laughed. She hollered that plaintiff was faking his paralysis and that no one should help him in any way. Then, defendant Nina left.

72. One day during the week plaintiff spent in B-200, a power failure occurred. TPCJC has a policy that when the power fails, inmates must go to their cells for lockdown. Plaintiff was bedridden. He now had no feeling from his feet to his knees, from the back of his thighs to above his buttocks, from his fingers to his elbows, and between his stomach and chest. He still had pain in his upper back and neck. During the power loss lockdown, a heaviness came to plaintiff's chest. He tried to sit up, believing that would help him breathe. He started wiggling to attempt to lay on his side. One of his legs slid off the bed. He listed, again; he could not stop the gravitational pull. He fell on the floor face down,

with one of his arms under him. He could not turn over to free his arm trapped under his upper body. Plaintiff's felt as though he was totally paralyzed. An inmate banged a chair against the cell to capture the attention of the corrections officer in the booth.

73. The officer in the booth communicated with the inmates by intercom. While plaintiff still lay on the floor, the inmates told the officer in the booth what had happened to plaintiff. They told him they were concerned about helping plaintiff after defendant Nina telling them they should not because plaintiff was a malingerer.

74. About an hour later, three officers came to the dorm. One of the officers asked plaintiff to explain why he could not get up. Plaintiff told the officer that everyone already knew, that it does no good for him to complain about his progressive paralysis, since no one will allow him to see a doctor, and he is accused of malingering and punished. One of the officers argued about a method in which he thought plaintiff could use his upper body if he really wanted to get up, even if plaintiff's legs were really paralyzed. Plaintiff tried to explain that the paralysis had progressed to such an extent that his chest muscles were as weak as his leg and arm muscles. Finally, the officer turned plaintiff on

his back, then lifted him and lay him on his bunk.

75.  Plaintiff's parents had arranged for an appointment with an orthopedic, as plaintiff believed his paralysis problem was related to a back problem that had been aggravated by the fall down the half flight of stairs days earlier. The orthopedic appointment was for November 21st. On that date, the officers who transported plaintiff rolled him in a wheelchair to the transportation vehicle, then refused to assist him in the vehicle. They ordered him to get in himself. Plaintiff told the officers his legs were paralyzed, his chest and arms were weak, and he could not get out of the wheelchair on his own. The officers pulled plaintiff out of the wheelchair, then dragged him into the car.

76.  The orthopedic examined plaintiff, then arranged for an MRI of his spine, which was done at Terrebonne Medical Center at the expense of plaintiff's parents. After the MRI, the officers transported plaintiff back to TPCJC. They treated him the same they had when they first put him in the car–dragging him in and out the car.

77.  At TPCJC, the officers wheeled plaintiff to the nurses station and left him sitting in the chair in the hall, against a wall. Defendant Whitney told plaintiff she was waiting for the results of the MRI taken at Terrebonne Medical

Center. About an hour later, Whitney walked up to plaintiff, laughing. She told him the MRI was within normal limits. Plaintiff told Whitney that he was not malingering, that the paralysis was increasing more rapidly. Just before Whitney began to walk away, plaintiff asked if he could be taken for a medical shower. Whitney leaned forward, sniffed the air around plaintiff, and then said something to the effect, "Okay, you do kind of stink."

78.  A corrections officer wheeled plaintiff to the shower, then set him on the shower seat. Plaintiff was having trouble controlling his arms, and could not clean himself, not even as well as he had in the first shower Whitney had permitted plaintiff. After about five minutes, another deputy asked the attending officer who is in the shower. When he was told it was plaintiff, the second officer began hollering, ordering plaintiff to come out, threatening to drag him out. Plaintiff told him he could not stand up, could not walk, and needed help to get out of the shower. The officers then ordered a trustee to remove plaintiff from the shower and to sit him in a wheelchair. The officers and trustee helped plaintiff get dressed, then wheeled him back to B-200, then lay him on his bunk. After a few minutes, plaintiff asked two inmates to drag him to the telephone so he could telephone his parents to tell them what happened. The inmates agreed.

79. Later that night, plaintiff felt heaviness in his chest, again, as though something heavy lay on him; he believed he would suffocate if he did not try to sit up. He asked an inmate to buzz the booth. The inmate did, but the officer did not respond. The inmate kept buzzing. The officer answered after about an hour. The inmates told him to send a medic, that plaintiff was having trouble breathing.  In the meantime, plaintiff had asked an inmate to call his mother, to tell her that he was having trouble breathing and needed help because no one would help him in the medical dorm, and that he thought he was going to die.

80. After plaintiff's mother called the TPCJC medical department angry and hysterical. Two medics escorted by a corrections officer entered Dorm B-200. One of the medics placed a device on plaintiff's finger, paused, then said to the other that plaintiff's oxygen was fine, that plaintiff was just hyperventilating. One of the medics told plaintiff that he should read a book and relax. The medics and officer left.

81. The next morning, November 22nd, plaintiff woke with nausea, dizziness, and greater heaviness with tightening of his chest. He asked an inmate for help to sit up so he could breathe.  A couple of inmates stepped to plaintiff's bunk to help plaintiff. They positioned themselves to lift plaintiff's upper body.

When they did that, plaintiff lost unconsciousness.

82.   When plaintiff regained consciousness, he lay strapped to The Board
not realizing he was at Chabert Clinic. His upper back and shoulders were
burning; he thought he was being tortured again, and yelled for someone to free
him. A physician calmed him, telling plaintiff that he would remain immobilized
for fear that he would roll off the stretcher. The doctor told him x-rays were
being looked at.

83. After calming, plaintiff realized that technicians or other medical
people were sticking and pricking his legs with pins and scraping the bottom of
his feet with something; as plaintiff watched, but could fell nothing.

84. The doctors questioned plaintiff exhaustively regarding his history and
the nature and progressive course of his symptoms. They ran tests, including an
EKG, a CT-Scan of his spine, and a spinal tap. After taking plaintiff's history and
confirming that plaintiff suffered paralysis in both feet and lower legs, the
doctors admitted plaintiff to the hospital.

85.   The doctors diagnosed Guillain-Barre' syndrome, a disease that for
unknown reasons, causes the body's immune system to attack peripheral nerves,
causing acute onset of paralysis of a progressive nature; the classic initial

symptoms are acute onset of numbness or paralysis in the feet and hands with progressive migration, and numbness in the tongue. The earlier the symptoms are treated, the more likelihood of recovery; the longer the delay in treatment, the greater the nerve damage and more likelihood of permanent disability.

86. At all times relevant to the acts of the defendants–including torture by hours of immobilization in pain, disciplinary isolation because of illness, denial of a wheelchair, forcing plaintiff to wobble in pain, forcing plaintiff to lay on the floor paralyzed, among other acts of cruel and unusual punishment–defendants intentionally and knowingly held plaintiff in TPCJC for  approximately four (4) months beyond his sentence, during which time plaintiff suffered from his crippling disease and the wanton conduct of the prison officials.

87. Plaintiff continually complained about not being released timely and advised defendants of his illegal detainment, but the defendants ignored him.

## VI. FIRST CAUSE OF ACTION

1. The named defendants either participated directly or knew of the commissions and omissions described above and amounted to deliberate indifference to plaintiff's health and safety by prison officials, denial of proper medical care, actively interference with medical treatment, knowingly

disregarding an excessive risk to plaintiff's health and safety while he was
incarcerated and his health dteriorating, and commission of acts against plaintiff
while crippled with disease amounting to unnecessary and wanton and
intentional infliction of pain repugnant to the conscience, all in violation of the
U.S. Constitution and Laws and Statutes of the United States as interpreted by
the United States Supreme Court.

2. The commissions and omissions of the defendants constitute cruel and
unusual punishment in violation of plaintiff's constitutional rights under the
Eighth and Fourteenth Amendments of The Constitution of the United States,
and violation of his Civil Rights under 42 U.S.C.S. § 1983, all as interpreted by
the United Supreme Court and all other federal courts thereafter, under which
plaintiff is entitled to general and special damages, punitive damages, plus
reasonable attorney fees.

## VII. SECOND CAUSE OF ACTION

The commissions and omissions of the defendants leading to plaintiff's
illegal confinement constitute violation of his civil rights and right to be free
from unlawful detainment guaranteed him in the United States Constitution, and
violates his Civil Rights under 42 U.S.C.S. § 1983, under which plaintiff is

entitled to general and special damages, punitive damages, plus reasonable attorney fees.

## VIII. THIRD CAUSE OF ACTION

The commission and omissions of the defendants constitute negligence under the laws of this State, and such conduct described herein constitutes intentional infliction of mental anguish under the Laws and jurisprudence of this State.

## IX.

During the weeks that defendants refused to believe plaintiff regarding his progressive paralysis, tortured him to "admit" that he was a malingerer, and placed him in an isolation cell to punish him, and force plaintiff to admit to his "malingering," plaintiff should have been freed months earlier. Had he not been illegally detained in violation of his constitutional rights, plaintiff could have sought timely medical care to resolve his progressive nerve disease.

## X.

During the weeks that the defendants refused to believe plaintiff, tortured him to "admit" that he was a malingerer by strapping him to The Board, and condemning him to disciplinary isolation, the disease that plaintiff suffered

progressed, causing a daily increased rate of permanent damage to plaintiff's

nerves.

## XI. DAMAGES

Because of the defendants' unconstitutional and tortuous conduct, the

failure of those responsible for operating the prison and supervising the

employees, plaintiff suffered the below damages, for which all defendants are

jointly and solidarily liable, *to-wit*:

a. Total and permanent disability;

b. Past, present, and future mental anguish;

c. Past, present, and future pain and suffering;

d. Loss of quality of life, including loss of future relationships and e
enjoyment of life;

e. Loss of future wages and income;

f. Loss of earning capacity;

g. Past, present, and future medical expenses and costs relating to
his crippled body; and

h. Future psychological and psychiatric care relating to the treatment
of the defendants.

## XII.

Because the defendants violated plaintiff's constitutional rights, plaintiff is entitled to punitive damages and reasonable attorneys fees, plus the above general and special damages.

## XIII.

Under Louisiana Law, plaintiff's minor sons are entitled to damages for loss of quality of companionship and association with their father.

## XIV.

Plaintiff requests and is entitled to trial by jury.

**Wherefore**, plaintiff, Reggie E. Guilbeau, prays that there be Judgment in his favor and against the named defendants and other unidentified individuals *in solido* in the full amount of **FIVE MILLION AND NO/100 ($5,000,000.00) DOLLARS**, plus punitive damages in an amount to be determined by this Court, reasonable attorney fees, judicial interest from the date of demand until the full verdict is paid, plus all costs.

**PLAINTIFF FURTHER PRAYS** that there be Judgment in his favor representing his minor sons in an amount to be determined by the Court, plus judicial interest from the date of demand until paid.

**PLAINTIFF FURTHER PRAYS** that this matter be tried by Jury.

**Respectfully Submitted:**

**GLYN J. GODWIN** (LSBA No. 6076)
Executive Plaza Building, Suite 900
10001 Lake Forest Boulevard
New Orleans, Louisiana 70127
Telephone: (504) 245-3911

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| REGGIE E. GUILBEAU,<br>                    Plaintiff | * | CIVIL ACTION |
| VERSUS | * | NUMBER |
| PARISH OF TERREBONNE, *ET AL.*,<br>                         Defendants | * | SECTION |
| | * | MAGISTRATE |
| *  *  *  *  *  *  *  *  *  *  *  * | * | JURY TRIAL |

## JURY ORDER

Considering the Complaint filed herein,

**IT IS ORDERED** this matter be tried before a Jury.

**New Orleans, Louisiana**, this _____ day of _____, 2003.


_____
U.S. DISTRICT COURT JUDGE